**FIRST DIVISION**
**BROWN, C. J.,**
**BARNES, P. J., and WATKINS, J.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**February 3, 2026**

# In the Court of Appeals of Georgia

A25A2034. CASILLAS v. THE STATE.

BROWN, Chief Judge.

William Casillas was convicted of armed robbery and other crimes arising from his participation in a convenience store robbery. He appeals from the denial of his amended motion for new trial, arguing that the trial court erred by allowing a witness to make an in-court identification over his objection and by ordering restitution without a hearing and without considering his ability to pay. For the following reasons, we affirm.

"On appeal from a criminal conviction, we view the evidence in the light most favorable to the verdict, with the defendant no longer enjoying the presumption of innocence." *Reese v. State*, 270 Ga. App. 522, 523 (607 SE2d 165) (2004). We neither

weigh the evidence nor judge the credibility of witnesses, but determine only whether, after viewing the evidence in the light most favorable to the prosecution, "any rational trier of fact could have found the essential elements of the crimes beyond a reasonable doubt." (Emphasis omitted.) *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).

So viewed, the evidence shows that Daily's convenience store in Gwinnett County had a counter inside the store where customers could cash checks, buy money orders, pay bills, or make wire transfers. On September 24, 2019, the manager's brother dropped off $40,000 in cash to the store for use in their check-cashing business. Nayara Sanchez and Casey Reyes were working as cashiers that day. Sanchez testified that during her shift, two masked men entered the store and went through the window of the check cashing booth. One of the men pointed a gun at her and grabbed the $40,000 in cash that was sitting under the counter. Sanchez recalled that the men were wearing black clothing and face masks. She did not recognize either one of them. After the men fled, she called the police.

Office Henry Johnson of Norcross Police Department responded to the robbery call. He interviewed Sanchez and Reyes. Officer Johnson testified that Sanchez was

"scared" and "shaking" when he interviewed her. He noticed that Reyes, on the other hand, was "calm," and appeared to keep busy on her phone to avoid answering his questions.

The store's manager later pulled surveillance videos for the police to review. The manager was able to identify Xavier Reyes as one of the robbers due to his height and distinctive walk, which he knew because Xavier is the brother of Casey Reyes, one of the store's cashiers. As the officer was reviewing this footage, he learned that another officer had apprehended Xavier nearby. Xavier was caught with $20,000 in cash and he confessed to being one of the men who had robbed Daily's. At trial, Xavier admitted that he participated in the robbery and that his sister had helped him plan the robbery. He also identified Casillas as his accomplice.

Melissa Sagneri lived near the store. Sagneri testified that she was standing at her kitchen window at about 6:00 p.m. on the date of the robbery when she saw two men walk between her house and a neighbor's house. This aroused her suspicion because it was not normal for strangers to be walking alongside her house. When she first saw the men, she was about "seven steps" away from them and it was light outside. Although she had a "diagonal viewpoint," Sagneri testified that she got "a

good look" at Casillas' face. Sagneri described the men as Hispanic and dressed in dark clothing. Sagneri noticed that one of the men appeared to be intentionally blocking the view of his face and that both men were "trying really hard to look inconspicuous." She further noticed that one of the men's pants pockets were noticeably "heavy and full." One of the men was "heavier and a bit taller," and the other was thinner. Because she was worried that these two men might be headed towards her elderly family members' house, she went to her front porch and "watched them aggressively" for nearly two minutes as they walked to the main street. Sagneri was not wearing her glasses when she spied the men. When Sagneri noticed officers nearby, she ran to them and gave a description of the two men and a direction of travel. At trial, Sagneri identified Casillas as one of the men she saw cutting through her yard.

The jury convicted Casillas of one count of armed robbery (Count 1), two counts of possession of a firearm during the commission of a felony (Counts 2 and 4), and one count of aggravated assault (Count 3). The trial court then merged Counts 3 and 4 into Count 1, and sentenced Casillas to an aggregate of 25 years, with the first 13 to serve in confinement. As a special condition of probation, the trial court required

Casillas to pay $20,000 in restitution, to be paid "joint and several with co-defendants." Casillas appeals from the denial of his amended motion for new trial.

1. Casillas maintains that Sagneri's in-court identification of him had been tainted by an improperly suggestive pretrial identification that had already been suppressed. Specifically, Casillas contends that Sagneri lacked a sufficient "independent origin" for her to be able to make a permissible in-court identification. We are unpersuaded.

After Sagneri flagged down police officers to give a description of what she saw, the officers showed her a photo line-up as part of the police investigation. The trial court granted Casillas's motion to suppress the photo line-up as being impermissibly suggestive. Although the trial court's order prevented Sagneri from testifying "regarding the line-ups and pretrial identification" of Casillas, it specifically did "not prevent or suppress [Sagneri] from identifying [Casillas] at trial, provided that any such in-trial identification does not depend upon her prior identification of [Casillas], but has an independent origin."

As our Supreme Court has explained, "[e]ven if a pretrial identification is tainted, an in-court identification is not constitutionally inadmissible if it does not

5

depend upon the prior identification but has an independent origin." (Citation and punctuation omitted.) *Scandrett v. State*, 293 Ga. 602, 603 (2) (748 SE2d 861) (2013). See also *Clay v. State*, 309 Ga. 593, 598 (4) (c) (847 SE2d 530) (2020). Under the facts of this case, we "need only determine that the record supports the trial court's determination that the in-court identification was based on an independent origin rather than any irregularity in the pretrial identification procedures." (Citation omitted.) *Zachary v. State*, 195 Ga. App. 870 (395 SE2d 71) (1990).

In its order denying Casillas's motion for new trial, the trial court concluded that such an independent origin existed because Sagneri "based her in-court identification of [Casillas] on her direct, personal observations . . . [and] not on information she learned from the suppressed pretrial identification." We agree. The information that Sagneri relied upon to make her in-court identification of Casillas had an "independent origin" apart from the suppressed pretrial identification. As noted above, Sagneri testified that she viewed Casillas from "seven steps" away under daytime lighting conditions, that she paid careful attention to Casillas due to his unusual behavior and her concern for her family's safety, and that she had a heightened degree of awareness from having been a prior victim of armed robbery.

Further, Sagneri testified that she "aggressively monitored" Casillas for about two minutes as he walked near her property, that she "got a good look" at his face and testified that she was "a hundred percent certain" that Casillas was the person she saw passing through her yard that day. See *Thomas v. State*, 355 Ga. App. 111, 116 (1) (b) (843 SE2d 1) (2020) (witness' prior identification of defendant had an independent origin when witness had the opportunity to observe the defendant's face during the incident); *Clark v. State*, 166 Ga. App. 366, 368-369 (3) (304 SE2d 494) (1983) (given the victim's testimony regarding his opportunity to observe the defendant at close range, his identification of the defendant did not depend upon the photographic line-up, but instead had an independent origin). Whether the fact that Sagneri was not wearing her eyeglasses impacted the credibility of her testimony was a matter for the jury. *Johnson v. State*, 348 Ga. App. 831, 837 (3) (823 SE2d 351) (2019).

Accordingly, we conclude that the trial court did not abuse its discretion by permitting Sagneri's in-court identification of Casillas at trial or in denying Casillas's motion for new trial. See *Scandrett*, 239 Ga. at 604 (2).

2. Casillas argues that the trial court erred by ordering restitution without conducting a separate restitution hearing or properly considering the factors listed in OCGA § 17-14-10 (a). We find no reversible error.

(a) Separate restitution hearing. Georgia law permits a trial court to enter an award of restitution in an amount that is not to exceed the victim's damages.[1] *Henderson v. State*, 361 Ga. App. 159, 162 (2) (863 SE2d 532) (2021). Under OCGA § 17-14-7 (b), a trial court must set a hearing to determine restitution "[i]f the parties have not agreed on the amount of restitution prior to sentencing[.]" Here, there is no indication from the record that the parties agreed to an amount of restitution to be awarded, so a hearing was required. However, we conclude that Casillas has waived any error in the trial court's decision to consider the restitution award during the sentencing proceeding, rather than a separate and distinct hearing.

At the conclusion of the trial and the pronouncement of the guilty verdict, the trial court immediately proceeded to a sentencing hearing with the consent of both parties. When asked whether it had a recommendation, the State responded with a

---

[1] The restitution statute defines "damages" as "all special damages which a victim could recover against an offender in a civil action, . . . based on the same act or acts for which the offender is sentenced, except punitive damages and damages for pain and suffering, mental anguish, or loss of consortium." OCGA § 17-14-2 (2).

sentence recommendation and proposed the imposition of certain conditions of probation, including restitution. Specifically, the State recommended that Casillas should be responsible for $20,000 in restitution, to be paid "joint and several with the co-defendants," because that was the unrecovered sum stolen from the store. The trial court provided Casillas's counsel the opportunity to make an argument and Casillas an opportunity to make a statement. Although Casillas's attorney knew that restitution was an issue, "he did not present or request to present evidence on the issue of restitution at the time; nor did he request a separate hearing on the issue of restitution." (Citation and punctuation omitted.) *Wilson v. State*, 355 Ga. App. 73, 76 (2) (842 SE2d 521) (2020). Accordingly, we conclude that Casillas has "waived any error in the decision of the trial court to decide the question of restitution as a part of the sentencing hearing, rather than in a separate and distinct hearing." (Citation and punctuation omitted.) Id.

(b) OCGA § 17-14-10 (a) Factors. In determining an amount of restitution to be awarded, the trial court is required to take into account the factors listed in OCGA § 17-14-10 (a). See OCGA § 17-14-7 (a). These factors include, among others, the defendant's financial resources, earnings, and financial obligations as well as the

9

amount of damages incurred and the goal of restitution to the victim and the goal of rehabilitation to the offender. OCGA § 17-14-10 (a) (1)-(5). At such a restitution hearing, the State "bears the burden of proving, by a preponderance of the evidence, the amount of loss sustained by the victim, while the defendant must prove both his financial resources, and the financial needs of his dependents." *Henderson*, 361 Ga. App. at 162 (2), citing OCGA § 17-14-7 (b). On appeal from an award of restitution, this Court "has the duty of reviewing the transcript to determine whether each party has met [its] specified burden and determine whether the restitution award was supported by the preponderance of the evidence." (Citation and punctuation omitted.) *Wilson v. State*, 355 Ga. App. at 76 (2).

Here, the State met its burden of proving the victim's loss by presenting evidence of the amount stolen from the store that had not yet been recovered. However, Casillas presented no evidence as to his financial circumstances or his ability to pay. Given this failure to meet his burden, Casillas has not shown that the trial court erred. See *Wilson*, 355 Ga. App. at 77 (2); *Tobias v. State*, 319 Ga. App. 320, 330 (5) (735 SE2d 113) (2012).

*Judgment affirmed. Barnes, P. J. and Watkins, J., concur.*