317 Ga. 466
FINAL COPY

S23A0684. JONES v. THE STATE.

MᴄMɪʟʟɪᴀɴ, Justice.

Xavier R. Jones appeals his convictions for felony murder and other crimes in connection with the shooting death of Christopher Crumby.[1] On appeal, Jones asserts that the evidence at trial was insufficient to sustain his convictions, the trial court erred in not granting his motion for directed verdict at trial, and the trial court erred in not granting his motion for new trial on the general grounds.

---

[1] Jones shot Crumby on July 27, 2010. In October 2010, a Thomas County grand jury indicted Jones—along with his co-defendants Jalen Rauls and Dezmond Lovejoy—for felony murder based on armed robbery, armed robbery, aggravated assault, and possession of a firearm during the commission of a felony. Jones was tried before a jury, separately from his co-defendants, from February 11 to 14, 2013, and the co-defendants' cases are not a part of this appeal. The jury found Jones guilty on all counts, and the trial court sentenced Jones to life in prison on the felony murder count, twenty years in prison on the aggravated assault count, and another five years in prison on the count of possession of a firearm, all to run consecutively. The armed robbery count was merged with the felony murder conviction for sentencing.

Jones filed a timely motion for new trial through his trial attorneys. He was later appointed new counsel, who filed an amended motion for new trial on February 21, 2022. After a hearing on March 21, 2022, the trial court denied the motion, as amended, on July 28, 2022. Jones filed a timely notice of appeal on August 24, 2022; the case was docketed to the April 2023 term of this Court and thereafter submitted for a decision on the briefs.

Jones also asserts that the trial court erred by admitting a video recording of Jones's interview in which Jones remained silent in response to some of the investigators' questions and comments, in denying his motion for mistrial on that ground, and by failing to meaningfully respond to a question submitted by the jury during deliberations. For the following reasons, we affirm Jones's convictions for felony murder and possession of a firearm during the commission of a felony but vacate his conviction for aggravated assault as it should have merged into his felony murder conviction.

At trial, the evidence showed the following. On July 27, 2010, Jones and his co-defendants, Jalen Rauls and Dezmond Lovejoy, attended a gathering in a Thomasville neighborhood. Crumby was also at the gathering and was seen with a bag of marijuana that he was "bagging up" into smaller bags. Later, Jones told Rauls and Lovejoy that he wanted to steal Crumby's marijuana. Rauls and Lovejoy testified that they agreed to Jones's plan to rob Crumby of his marijuana at gunpoint that night, but Rauls and Lovejoy carried

2

unloaded firearms, and they did not plan on shooting or killing Crumby.[2] At around 11:00 p.m., as Crumby walked along a sidewalk in the neighborhood, he encountered Rauls and Lovejoy, while Jones crouched in the tall grass of an adjacent empty lot to conceal himself. Rauls and Lovejoy said that when Crumby approached the lot, Jones stood up and shot Crumby three times. Three other witnesses saw the shooting, and one of them who knew Jones identified him as the shooter. Rauls and Lovejoy testified that they did not see Crumby fire any shots. Although Lovejoy and another witness saw Crumby reaching for his pocket, they did not see Crumby draw a gun.

Multiple witnesses in the area at the time of the shooting testified to hearing between two to four gunshots. Most witnesses—including Rauls and Lovejoy—reported a total of three gunshots. Two of the witnesses testified that they saw muzzle flashes from only one firearm. Those two witnesses also testified that after shooting Crumby, Jones approached Crumby and kicked him, as if checking to

---

[2] Rauls and Lovejoy each later pleaded guilty to armed robbery.

3

see if he was responsive,[3] before reaching down toward Crumby. Lovejoy and Rauls, as they fled the scene, saw Jones reach into Crumby's pocket and remove marijuana, and Lovejoy, Rauls, and another witness testified to seeing Jones after the shooting with marijuana that was packaged like the marijuana previously seen in Crumby's possession.

Rauls and Lovejoy testified that when Jones later caught up with them after the shooting, he told them he had just shot Crumby, but he never claimed that Crumby had fired first or that Jones fired in self-defense.[4] A friend who picked up Jones, Rauls, and Lovejoy shortly after the shooting also testified that Jones said that he had "just shot someone," but no one mentioned that Crumby fired any shots.

---

[3] The medical examiner who performed the autopsy testified that Crumby died from a gunshot wound to the forehead and that anyone who received such a wound would be immediately incapacitated.

[4] In response to defense counsel's question on cross-examination, Lovejoy testified that he recalled that Jones had said that Crumby was trying to shoot him, but, later, on re-direct, he testified that prior to the day of the trial, Jones had never told him that Crumby shot at him and that he only heard that Jones had said such a thing from defense counsel.

Jones testified at trial that the robbery was planned solely by Rauls and Lovejoy, whom he accompanied only as a friend without any intention or agreement to assist them. Jones said that he hid in the tall grass behind a fence—obscuring himself from the direction of Crumby's approach—to avoid taking any part in the robbery. Jones further testified that he fired two shots at Crumby in self-defense, only after Crumby first shot at Jones. Jones also denied taking Crumby's marijuana, testifying that he only approached Crumby to look for Crumby's gun but could not find it.

A revolver was recovered from the sidewalk about ten to twenty feet from Crumby's body, and although the revolver was later connected to Crumby, no gunpowder residue test was conducted to see if Crumby fired the revolver because investigators believed such testing would likely show a false positive given that Crumby was himself shot. Moreover, the Thomasville Police Department ("TPD") did not secure the crime scene with police tape after the shooting, and the next day city workers mowed the tall grass in the empty lot where

5

Jones had concealed himself before police investigators searched it. When a search was later conducted, TPD and Georgia Bureau of Investigation ("GBI") investigators found two spent cartridges linked to Jones's firearm and brand of ammunition but recovered no bullets linked to Crumby's revolver in the vicinity.[5] One spent cartridge was found in the cylinder behind the revolver's barrel. However, a firearms expert could not determine whether it had been fired during or prior to Crumby's shooting.

Jones turned himself in to a police station a few days after the shooting, and he was then interviewed by investigators. During that interview, Jones denied shooting Crumby or even being at the crime scene. However, two years later, at the preliminary hearing, after the State revealed that investigators had recovered Crumby's revolver, Jones admitted he shot Crumby, but claimed that he had done so in self-defense. At trial, Jones admitted that he made no mention that

---

[5] Jones argued at trial that failing to secure the lot and allowing mowers to cut the grass compromised the crime scene and undermined the validity of the ballistics evidence.

Crumby had a gun, that Crumby fired first, or that Jones shot Crumby only to defend himself until the preliminary hearing. Jones said that he had not mentioned Crumby's revolver or being fired upon during that period because he had doubted himself as to whether Crumby had fired at him and that he was unaware of the defense of self-defense before his counsel told him about it.

1. Turning first to Jones's related arguments in connection with the sufficiency of the evidence presented at trial, we see no merit in his claims.

(a) *Sufficiency*: In the first of these arguments, Jones asserts, generally, that the evidence was constitutionally insufficient to support his convictions.[6] "When reviewing the sufficiency of the evidence, we view the evidence presented in the light most favorable to the verdicts to determine whether a rational trier of fact could have

---

[6] Although Jones challenges the sufficiency of the evidence to support all of his convictions, his argument as to the armed robbery charge is moot because he was not sentenced on that charge. See *Rich v. State*, 307 Ga. 757, 759 (1) n.2 (838 SE2d 255) (2020). Nevertheless, we consider the sufficiency of the evidence to show armed robbery in the context of the felony murder charge.

found the defendant guilty beyond a reasonable doubt." *Ward v. State*, 316 Ga. 295, 298 (2) (888 SE2d 75) (2023), citing *Jackson v. Virginia*, 443 U.S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979). "Under this review, we must put aside any questions about conflicting evidence, the credibility of witnesses, or the weight of the evidence, leaving the resolution of such things to the discretion of the trier of fact." *Frazier v. State*, 308 Ga. 450, 452-53 (2) (a) (841 SE2d 692) (2020) (citation and punctuation omitted).

Jones makes no effort in his appellate briefing to address the charges individually or to identify the elements he contends the State failed to prove, and we conclude that the evidence recounted above is sufficient to support his convictions. See *Charles v. State*, 315 Ga. 651, 651, 654-55 (2) (884 SE2d 363) (2023) (affirming convictions where defendant asserted that the evidence was constitutionally insufficient but failed to articulate "why he contend[ed] that the trial evidence was insufficient to support his convictions, much less formulated an argument showing that the trial evidence failed to

prove an essential element of any crime charged beyond a reasonable doubt"); *Davis v. State*, 312 Ga. 870, 871, 873 (1) n.2 (866 SE2d 390) (2021) (affirming a defendant's convictions where defendant's only argument was a meritless claim that the State failed to disprove his self-defense theory and he "ha[d] not otherwise shown that the evidence supporting [his] convictions was insufficient as a matter of constitutional due process"); *Tyler v. State*, 311 Ga. 727, 732-33 (2) (859 SE2d 73) (2021) (holding that the evidence showing that the defendant shot the victim before taking property was constitutionally sufficient to support his conviction for armed robbery and explaining that "[a] defendant may be convicted of committing a robbery if he kills the victim first and then takes property in his possession").

(b) *Directed verdict*: Jones next asserts that the trial court erred in denying his motion for directed verdict and merely incorporates his cursory arguments with regard to the sufficiency of the evidence as support for this argument. "The standard of review for the denial of a motion for a directed verdict of acquittal is the same as for

9

determining the sufficiency of the evidence to support a conviction." *Monroe v. State*, 315 Ga. 767, 768 (1) (884 SE2d 906) (2023) (citation and punctuation omitted). See *Holmes v. State*, 307 Ga. 441, 443 (1) (b) (836 SE2d 97) (2019) (citing *Jackson* standard for reviewing denial of directed verdict of acquittal).

Because we have determined that the evidence was sufficient as a matter of constitutional due process, we conclude that the trial court did not err in denying Jones's motion for directed verdict. See *Ward*, 316 Ga. at 300 (4) (where the evidence was sufficient to support the defendant's convictions, the trial court did not err in denying his motion for directed verdict).

(c) *General grounds*: In the third of these arguments, Jones argues that the trial court erred in failing to grant his motion for new trial on the general grounds under OCGA §§ 5-5-20 and 5-5-21.[7] But

---

[7] OCGA § 5-5-20 provides that "[i]n any case when the verdict of a jury is found contrary to evidence and the principles of justice and equity, the judge

10

this argument is "not properly addressed to this Court as such a decision is one that is solely within the discretion of the trial court." *Boles v. State*, 316 Ga. 209, 215 (2) n.8 (887 SE2d 304) (2023) (citation and punctuation omitted). "Therefore, when a defendant appeals the trial court's denial of a motion for new trial, an appellate court does not review the merits of the general grounds." Id. (citation, punctuation and emphasis omitted). See also *Ridley v. State*, 315 Ga. 452, 456 (3) (883 SE2d 357) (2023).

Here, the trial court's order denying the motion for new trial cites the correct standard for considering the general grounds in denying Jones's motion for new trial, and there is nothing further for this Court to review. See *Doricien v. State*, 310 Ga. 652, 653 (1) n.2 (853 SE2d 120) (2020) (nothing for appellate court to review

---

presiding may grant a new trial before another jury." OCGA § 5-5-21 states that "[t]he presiding judge may exercise a sound discretion in granting or refusing new trials in cases where the verdict may be decidedly and strongly against the weight of the evidence even though there may appear to be some slight evidence in favor of the finding."

where defendant "simply disagrees with the trial court's decision to deny him relief" under the general grounds).

2. Jones also contends that the trial court erred in admitting into evidence a video recording of his police interview and in denying his motion for mistrial based thereon, arguing that because the recording showed that Jones failed to respond to some of the investigators' questions and comments, including whether Jones had acted in self-defense, the State intentionally and improperly used his silence as direct evidence of his guilt.

At trial, the State played the first 48 minutes, 42 seconds of the recorded interview for the jury. The recording shows that before Jones was questioned, TPD Detective Louis Schofill read Jones his rights under *Miranda v. Arizona*, 384 U.S. 436 (86 SCt 1602, 16 LE2d 694) (1966), including his right to remain silent. Jones verbally acknowledged each right and signed the TPD's standard form

waiving those rights.[8] After Jones signed the waiver, Detective Schofill and GBI Special Agent Bahan Rich informed Jones that based on statements by his co-defendants and other witnesses, they had already concluded that Jones, Rauls, and Lovejoy planned to rob Crumby at gunpoint; that Jones shot Crumby; and that Jones took Crumby's marijuana from his pockets before fleeing the scene. Throughout the interview, Jones consistently denied shooting Crumby or even being present when Crumby was shot.

At one point during the interview, the investigators played Jones a recorded phone call in which Rauls admitted that he and Jones planned to rob Crumby and that Jones shot Crumby. After that recording was played, Jones stopped verbally responding to most of the investigators' remaining questions, although he sometimes shook his head from side to side, and when he did speak,

---

[8] At no point during the portion of the interview played for the jury did Jones formally rescind the waiver of his right to silence or indicate that he wanted to halt the interview.

13

he persisted in denying that he shot Crumby. Throughout the interview, the investigators repeatedly pressed Jones to give his side of the story, and Special Agent Rich suggested multiple times that Jones may have shot Crumby because he believed that Crumby was reaching for a gun, but Jones did not reply. Both officers told Jones that they believed the shooting was accidental and that he was "a good kid" but his silence and refusal to explain his actions would make him appear to be guilty or even "like a stone-cold killer." Jones replied that he had not shot Crumby.

Jones's counsel raised no contemporaneous objection when this recording was played at trial. Although he indicated that his co-counsel "might address" an objection to the trial court at the next break, no such objection appears in the record. After the video recording was played and the jury was excused for the day, Jones's counsel objected and moved for a mistrial on the grounds that the evidence from the recording was substantially more prejudicial than probative and that it was a comment on Jones's constitutional right

14

to remain silent because the investigators told him at several points that his silence was proving his guilt; and that as long as what Jones told the investigators was exculpatory, it should not have been admitted.[9] The trial judge denied the motion for mistrial, noting that he had reviewed the interview recording and he viewed the investigators' approach as aggressive interview tactics—not as impermissible commentary on Jones's exercise of the right to remain silent.[10]

---

[9] Jones's counsel inexplicably argued:

> And also, it's exculpatory because even if what he's telling the police at the time for whatever reason doesn't turn out to be true, as long as it's not incriminating him in connection with the crime, in other words, as long as he's not saying, well, I was there but I didn't take part in the robbery, I mean, he can give an alibi, he can give I didn't do it, as long as it's exculpatory, it shouldn't be admitted.

[10] Later, in its order denying the motion for new trial, the trial court indicated that after the motion hearing, it had reviewed the recorded interview again. Based on the review of the recording, the trial court continued to believe that the investigators' comments were an attempt to elicit Jones's version of events, and were "aggressive interrogation techniques attempting to gain the truth," and not improper comments on Jones's exercise of the right to silence. The trial court further found that the evidence did not go to the substance of Jones's defense and that no substantial prejudice resulted from the introduction of that evidence.

As an initial matter, we must determine the appropriate standard of review given the timing of Jones's objection and motion for mistrial. "In order to preserve an objection for [ordinary] appellate review, the specific ground of the objection must be made at the time the challenged evidence is offered." *Anthony v. State*, 302 Ga. 546, 549 (II) (807 SE2d 891) (2017). Similarly, "[a] motion for mistrial must be promptly made as soon as the party is aware of the matter giving rise to the motion." *Ragan v. State*, 299 Ga. 828, 833 (3) (792 SE2d 342) (2016) (citation and punctuation omitted) (motion for mistrial untimely when motion was made after State concluded direct examination of witness during which photographs at issue were admitted). It is clear from the record that the objection and motion for mistrial were not timely, as they were not made contemporaneously with the introduction of the evidence but rather at the end of the day after the recording had been played for the jury and the jurors had been dismissed. Moreover, Jones has not pointed us to, nor have we located, anything in the record to show that he

otherwise preserved these issues for direct appellate review.[11] See

*Daker v. State*, 300 Ga. 74, 75 (1) (792 SE2d 382) (2016) (on appeal,

"[i]t is the burden of the complaining party, including pro se

appellants, to compile a complete record of what happened at the trial

level" (citation and punctuation omitted)).

The failure to raise a timely motion for mistrial waives for

appellate review any alleged error in the trial court's denial of the

motion. See *Neloms v. State*, 313 Ga. 781, 785 (2) (873 SE2d 125)

(2022) ("If the defendant did not make a contemporaneous motion for

---

[11] Jones has not pointed us to any earlier objections he raised to the admission of the recording in the appellate record, such as a motion to suppress, nor did we find any such objections. The record includes a request filed by the State for a pretrial determination of the admissibility of that evidence, and apparently a motions hearing was scheduled, but neither a transcript of that hearing nor an order ruling on the State's motion is included in the appellate record. The trial court's order denying the motion for new trial and the trial transcript indicate that the trial court ruled before trial that the State could play the first 56 minutes, 22 seconds of the recording. And although the motion-for-new-trial order indicates that Jones's counsel objected to the use of the recorded interview on the grounds that it was more prejudicial than probative and that it contained improper comment on Jones's silence in response to questions asked during the interview, it does not state that Jones raised these objections before he voiced them at trial in connection with his motion for mistrial. Therefore, we cannot discern from the record that Jones properly preserved his objection to this evidence for ordinary appellate review.

a mistrial at the time the defendant became aware of the matter giving rise to the motion, then the defendant has waived review of this issue on appeal." (citation and punctuation omitted)).

Turning to Jones's separate claim that the trial court abused its discretion by admitting the video recording, the absence of a timely objection limits our review of the admission of the evidence to plain error. See *Huff v. State*, 315 Ga. 558, 564-65 (2) (883 SE2d 773) (2023) (failure to timely object to admission of evidence limits review to plain error only). To establish plain error, Jones "must point to an error that was not affirmatively waived, the error must have been clear and not open to reasonable dispute, the error must have affected his substantial rights, and the error must have seriously affected the fairness, integrity, or public reputation of judicial proceedings." *Lopez v. State*, 310 Ga. 529, 537 (7) (852 SE2d 547) (2020) (citation and punctuation omitted), overruled on other grounds by *Johnson v. State*, 315 Ga. 876, 877, 884 (2) (b) (885 SE2d 725) (2023). Generally speaking, an error that affects substantial rights is one that "affected

18

the outcome of the trial court proceedings." *Simmons v. State*, 314 Ga. 883, 889 (2) (880 SE2d 125) (2022) (citation and punctuation omitted). "The Court need not analyze all of the elements of the plain error test when the appellant fails to establish one of them." Id. (citation and punctuation omitted).

Even assuming (without deciding) that it was clear error to admit the portions of the video recording that Jones contends contained commentary on his silence, we conclude that any error did not affect Jones's substantial rights because the evidence of Jones's silence in the face of the investigators' questions and comments was cumulative of other properly admitted evidence at trial and was harmless in light of the substantial evidence of Jones's guilt.

Here, the State presented testimony from three witnesses who spoke with Jones in the aftermath of the shooting—Rauls, Lovejoy, and the friend who gave the three co-defendants a ride that night— and they all testified that while Jones admitted to shooting Crumby, Jones did not claim that Crumby drew a gun, that Crumby shot first,

or that he shot to defend himself. Jones does not contest the admissibility of this testimony. And Jones himself testified that he did not make such a claim for two years until the preliminary hearing. Thus, any allegedly impermissible commentary on Jones's failure to respond to some of the investigators' questions and comments was cumulative of other properly admitted evidence showing that he did not claim self-defense for two years after the shooting.

And the evidence of Jones's guilt was substantial. Multiple witnesses saw Jones shoot Crumby, and Jones himself admitted to the shooting to his co-defendants. Although Jones initially denied shooting Crumby or even being at the crime scene in his interview with investigators, Jones eventually admitted to the shooting in court. And, although he asserted he shot in self-defense, he was the only witness to testify that Crumby pulled or shot a weapon that night. Multiple witnesses from the scene testified that Crumby did not draw his firearm, did not shoot at Jones, and that the muzzle

flash came from only one gun. Other than Jones's testimony, the evidence was consistent in showing that Jones came out of his hiding place by the fence, shot at Crumby, and stole Crumby's marijuana, but that Crumby did not fire at Jones.

Under these circumstances, Jones has failed to establish how the admission of the recorded interview affected the outcome of the trial, and thus he cannot prevail on his claim of plain error. See *Perryman-Henderson v. State*, 316 Ga. 626, 632-33 (3) (889 SE2d 814) (2023) (appellant failed to show how alleged error affected his substantial rights in light of the evidence against him, which included eyewitness testimony that was not consistent with his version of events); *Merritt v. State*, 311 Ga. 875, 889 (6) (860 SE2d 455) (2021) (no plain error in admitting OCGA § 24-4-404 (b) evidence because of "significant physical and forensic evidence" establishing guilt and testimony by a witness to the shooting and other testimony of prior acts of domestic violence against victim, which contradicted defendant's accident defense).

3. Jones contends that the trial court erred in failing to meaningfully respond to a note submitted by the jury during deliberations.

After closing arguments, the trial court charged the jury on felony murder and, at the request of Jones's counsel, on the offense of voluntary manslaughter. Approximately one hour into deliberations, the jury submitted a note to the court that read "definition of felony murder" and underneath it, "involuntary murder." In a discussion with counsel, the trial court noted that "involuntary murder . . . is not what we've been talking about," and then informed the attorneys of his plan to re-read to the jury his prior charges on felony murder and voluntary manslaughter without directly addressing the phrase "involuntary murder." When asked whether he had "any problems" with that plan, Jones's counsel raised no objection, but replied that he had a request that the trial court ask the jury whether the phrase "involuntary murder" was a question or a verdict, "because it makes a difference." The trial court replied, "Whatever. It's a question now," and confined his response to re-reading the charges on felony murder,

which also included the definition of armed robbery, and voluntary manslaughter. When asked whether he had any exceptions to the recharge, Jones's counsel replied in the negative. The record does not show that the jury asked any additional questions about "involuntary murder" after having been recharged by the trial court.

Because Jones did not object to the trial court's response to the jury's note, we are limited to reviewing Jones's argument for plain error. See *Lopez*, 310 Ga. at 537 (7) (failure to object to recharge limits review to plain error). See also *Blake v. State*, 292 Ga. 516, 517 (2) (739 SE2d 319) (2013) (same). As Jones has failed to carry his burden of showing that the trial court committed clear and obvious error, we conclude that Jones has failed to show plain error.

It is well settled that "[a] trial court has a duty to recharge the jury on issues for which the jury requests a recharge." *Flood v. State*, 311 Ga. 800, 806 (2) (b) (860 SE2d 731) (2021) (citation and punctuation omitted). But "our precedent holds that . . . [t]he need, breadth, and formation of additional jury instructions are left to the

23

sound discretion of the trial court." *Lewis v. State*, 311 Ga. 650, 663 (3) (859 SE2d 1) (2021) (citation and punctuation omitted).

Here, the jury sought the definition of felony murder and wrote the phrase "involuntary murder" below that request, without asking a direct question about this concept. Jones argues that the jury's reference to the non-existent legal concept of "involuntary murder" demonstrates confusion on the jury's part about the charges at issue in the case and that the trial court should have sought clarification on what the jury meant by "involuntary murder" and should have clearly explained that it is "a non-existent legal concept."[12]

In support of this argument, Jones relies on *Freeman v. State*, 142 Ga. App. 293, 294 (4) (235 SE2d 560) (1977). In that case, the jury asked two questions during deliberations—a question about the definition of burglary and a second question "as to the fact of 'guilt

---

[12] "Involuntary murder" is not a legal concept under Georgia law. See OCGA § 16-5-1. Involuntary manslaughter is the only involuntary form of homicide recognized by Georgia criminal law, but Jones's counsel did not request, and the trial court did not provide, a jury charge on that offense. See OCGA § 16-5-3.

by association and knowledge of the crime prior to and after the crime had been committed is in fact guilt' that we should be able to decide upon." Id. (punctuation omitted). The trial court recharged the jury on the definition of burglary and then instructed the jury to consider the evidence and instructions previously given. See id. The Court of Appeals held that the trial court instead "should have instructed the jury that there is no such thing as guilt by association and that they should dismiss that thought from their minds" because when a jury "is confused and in doubt and requests further instructions on a particular point, it is the duty of the court to further instruct them." Id. at 294-95 (4).

*Freeman* is distinguishable. In *Freeman*, the jury asked a question about "guilt by association," which the trial court did not address except by referring the jury generally to the evidence and

instructions as previously given.[13] See 142 Ga. App. at 294 (4). In contrast, the trial court here acted within its discretion in interpreting the jury's note as asking for the definition of voluntary manslaughter, which had been previously given, and in recharging the jury on that definition. See *Flood*, 311 Ga. at 806 (2) (b) (trial court has duty to recharge on issues for which the jury requests a recharge).

Because Jones has not pointed to any case, and we have found none, that supports that it is clear legal error for the trial court to fail to seek clarification from the jury under these circumstances or to charge that "involuntary murder" is not a valid legal concept, we conclude that Jones has not been able to establish plain error. See

---

[13] Some of us question whether the Court of Appeals correctly determined that the trial court abused its discretion in referring the jury to the evidence and instructions as previously given under these circumstances. See *Lewis*, 311 Ga. at 663 (3) ("[A] trial court has discretion to decline to answer the jury's question directly, and instead to direct the jurors to rely on instructions previously given." (citation and punctuation omitted)); *Redding v. State*, 296 Ga. 471, 473 (2) (769 SE2d 67) (2015) (no plain error in directing jury to rely on previous instructions, as "[w]e have never held . . . that the court must engage in a question and answer session with the jury or instruct the jurors individually on how to apply the law to the facts" (citation and punctuation omitted)).

*Stepp-McCommons v. State*, 309 Ga. 400, 405-06 (3) (845 SE2d 643) (2020) (rejecting appellant's claim that the trial court plainly erred when it directed the jury to its prior instructions); *Jackson v. State*, 306 Ga. 475, 478-79 (3) (831 SE2d 755) (2019) (no abuse of discretion in the trial court's decision to recharge the jury in full on malice murder and voluntary manslaughter in response to the jury's question asking for clarification on the difference between malice murder and involuntary manslaughter, the latter of which was not an issue in the case).

4. Although Jones does not raise an issue regarding his sentencing on appeal, we have identified a merger error in the trial court's sentence on aggravated assault, which we address sua sponte. See *Dixon v. State*, 302 Ga. 691, 696-97 (4) (808 SE2d 696) (2017) ("We have the discretion to correct merger errors sua sponte . . . because a merger error results in an illegal and void judgment of conviction and sentence."). Jones was found guilty of felony murder predicated on armed robbery, armed robbery, and aggravated

assault.[14] The trial court sentenced Jones to life in prison on the felony murder count and 20 years in prison on the aggravated assault count, to run consecutively, but merged the guilty verdict on the predicate offense of armed robbery for sentencing.

However, "[b]ecause there is no element of aggravated assault with a deadly weapon that is not contained in armed robbery, that form of aggravated assault will merge into armed robbery if the crimes are part of the same act or transaction." *Hood v. State*, 309 Ga. 493, 502-03 (4) (847 SE2d 172) (2020) (citation and punctuation omitted). The same merger analysis applies whether considering armed robbery or felony murder based on armed robbery and aggravated assault with a deadly weapon. See *Long v. State*, 287 Ga. 886, 888 (2) n.2 (700 SE2d 399) (2010). Here, the indictment charged Jones with aggravated assault with a deadly weapon, "to wit[,] . . . during the commission of the offense of armed robbery." And the

---

[14] Jones was also convicted of possession of a weapon during the commission of a felony, but that conviction is not a part of the merger analysis.

evidence at trial showed that the aggravated assault of Crumby was part of the same transaction as the armed robbery of Crumby. Therefore, the aggravated assault count should have merged with the conviction for felony murder based on armed robbery. See *Hood*, 309 Ga. at 502-03 (4); *Long*, 287 Ga. at 888-89 (2) (recognizing that aggravated assault with a deadly weapon merges into felony murder predicated on armed robbery). Jones's conviction for aggravated assault is hereby vacated.

*Judgment affirmed in part and vacated in part. All the Justices concur.*

Decided October 11, 2023.

Murder. Thomas Superior Court. Before Judge Hardy.

*Andrew V. Thomas II*, for appellant.

*Bradfield M. Shealy, District Attorney, Jessua C. Hornsby, James L. Prine II, Assistant District Attorneys; Christopher M. Carr, Attorney General, Beth A. Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Matthew B. Crowder, Assistant Attorney General*, for appellee.